UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE WINDRIDGE OF NAPERVILLE )
CONDOMINIUM ASSOCIATION, )
) 16 C 3860
Plaintiff, )
) Judge Feinerman
vs. )
)
PHILADELPHIA INDEMNITY INSURANCE )
CO., )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

The Windridge of Naperville Condominium Association alleges in this diversity suit that its insurance policy with Philadelphia Indemnity Insurance Company ("PIIC") entitles it to an independent appraisal to value certain storm damage sustained by one of its buildings. Doc. 19. Windridge has moved to compel an appraisal. Doc. 25. The motion is granted in part and denied in part.

**Background**

On May 20, 2014, a hail storm damaged one of Windridge's buildings. Doc. 19 at ¶ 5. Windridge holds an insurance policy issued by PIIC covering damage to the building. *Id*. at ¶ 6. The policy's "Appraisal" provision states:

> If we and you disagree on the value of the property or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

*Id*. at ¶ 9.

After Windridge submitted a claim, PIIC paid $2,111,717.96 for losses it conceded to be within the policy's scope. Doc. 34-2 at 2. Windridge believes that its losses are greater. First, although the storm directly damaged only the building's south and west sides, Windridge seeks payment to repair the north and east sides, so that all four sides will match. Doc. 34-1 at 3; Doc. 34-2 at 3. Second, Windridge seeks reimbursement for the overhead and profit component of the bills submitted by its contractor. Doc. 34-1 at 3-4. Third, Windridge seeks payment for repairs made to the building's roof. Doc. 35 at 5.

Windridge demanded an appraisal to resolve those disputes. Doc. 34-1 at 3. PIIC refused to appoint an appraiser or to engage in the appraisal process. Doc. 34-1 at 3-4.

## Discussion

### I. Whether Appraisal is Appropriate on the Three Disputed Issues

#### A. The Building's North and East Sides

The storm physically damaged the building's south and west sides, requiring their repair. Windridge claims that although the north and east sides were not *physically* damaged, they should be repaired as well to ensure an aesthetic match with the newly repaired south and west sides. Windridge argues that this dispute presents a question for the appraisal panel, which can determine whether the aesthetic mismatch is so significant as to constitute "damage" and, if so, assess a loss amount. PIIC responds that this is a question of coverage, not loss amount, and thus inappropriate for appraisal. PIIC is correct.

As noted, the policy states that if "[PIIC] and [Windridge] disagree on the *value* of the property or the *amount* of 'loss', either may make written demand for an appraisal of the 'loss'." Doc. 28-1 at 17 (emphasis added). The policy defines "loss" as "accidental loss or damage." *Id*. at 26. The parties dispute whether PIIC must pay to repair the two sides of the building that the

storm did not physically damage. The sole question is one of coverage: whether the policy covers the need to make an aesthetic match when only certain parts of the building sustain physical damage and are repaired while other parts are not.

Windridge disagrees, arguing that the dispute over repair to the north and east sides involves causation—whether the aesthetic mismatch can be said to have been caused by the hail storm—and causation cannot be distinguished from loss amount. Doc. 27 at 3-8. In support, Windridge quotes *201 North Wells, LLC v. Fidelity & Guaranty Ins. Co.*, 00 C 3855 (N.D. Ill. Feb. 2, 2001) (reproduced at Doc. 28-2), for the proposition that "if a building has damage before a covered event occurred, the appraiser cannot determine the amount of the loss without evaluating what damage was caused by the covered event and which damage was caused, for instance, by previous wear and tear." *Ibid*.

That the cause of a loss and an estimate of its amount are often related is true, but beside the point. Windridge seeks the cost of repairing the physically undamaged sides to remedy a mismatch with the now-repaired damaged sides. There is no causation issue here; the hail storm physically damaged two sides, requiring their repair, and, as a result, those two sides no longer match the two other sides. The only question is coverage: whether this mismatch is a "loss" within the meaning of the policy. And because the only question concerns coverage, the dispute is not subject to appraisal. *See Lytle v. Country Mut. Ins. Co.*, 41 N.E.3d 657, 663 (Ill. App. 2015) (denying appraisal of a dispute over whether the cost of compliance with building ordinances was covered by the policy); *FTI Int'l, Inc. v. Cincinnati Ins. Co.*, 790 N.E.2d 908, 909-10 (Ill. App. 2003) (denying appraisal of a dispute over whether the insured was entitled to the replacement cost or the sales price of the damaged property).

## B. Overhead and Profit

As the parties explained at the motion hearing, it is industry custom for a general contractor making repairs to charge "10 and 10," or 10% for profit and 10% for overhead on top of the amounts the general contractor pays to the subcontractors. By contrast, if only a single tradesman is required to complete a job, overhead and profit are not charged. PIIC contends that the question whether it must reimburse Windridge for the overhead and profit charged by its contractor is a coverage question not subject to appraisal.

The policy describes the loss payment procedure as follows:

> In the event of "loss" to Covered Property covered by this Coverage form, at our option, we will either:
>
> (1) Pay the value of lost or damaged property;
>
> (2) Pay the cost of repairing or replacing the lost or damaged property;
>
> (3) Take all or any part of the property at an agreed or appraised value; or
>
> (4) Repair, rebuild, or replace the property with other property of like kind and quality.

Doc. 28-1 at 18. The policy describes the valuation procedure as follows:

> We will determine the value of the Covered Property in the event of a loss as follows:
>
> a. At replacement cost (without deduction for depreciation) as of the time of the "loss"…
>
> (1) We will not pay more for "loss" on a replacement costs basis than the least of:
>
> (a) The Limit of Insurance applicable to the lost or damaged property;
>
> (b) The cost to replace the lost or damaged property with other property:

4

>                       (i) Of comparable material and quality; and
>                       (ii) Used for the same purpose; or
>
>               (c) The amount you actually spend that is necessary to
>               repair or replace the lost or damaged property.

*Id*. at 20. These provisions obligate PIIC under certain circumstances to pay the cost of repairing or replacing the damaged property. If repairing or replacing the property requires a general contractor, then the cost of repair or replacement includes the industry-standard overhead and profit. No policy language suggests that if a general contractor is required, PIIC may decline to pay the overhead and profit component of a general contractor's charges. So the coverage question is clear: if a general contractor is required to repair or replace the damaged property, PIIC must pay the overhead and profit components of the general contractor's charges. The only disputed question is whether a general contractor is necessary to perform the repairs, or whether a single tradesman would suffice.

As the policy states, appraisal is appropriate where there is a disagreement about the amount of loss. In calculating repair or replacement cost, it is necessary to assess what must be replaced or repaired, who is qualified to perform that work, and how much that work costs. That inquiry requires determining whether a general contractor is needed, in which case profit and overhead is part of the loss, or whether a single tradesman can do the work. That determination is a question proper for appraisal. *Cf. Vill. of Ringwood v. Foster*, 932 N.E.2d 461, 463-64, 472 (Ill. App. 2010) (describing how various damage estimates included overhead and profit); *Shifrin v. Liberty Mut. Ins.*, 991 F. Supp. 2d 1022, 1031-32 (S.D. Ind. 2014) (describing an adjuster's decision to revise a damage estimate to account for overhead and profit).

### C. The Roof

The parties' filings do not illuminate the exact nature of the dispute over storm damage to the building's roof. When pressed at the motion hearing, Windridge's counsel stated: "I don't think there's a dispute regarding scope. I think it is the cost. I don't think there's a significant dispute regarding what needs to be replaced, but I think the cost would be the difference. Would you agree with that, counsel?" PIIC's counsel responded: "[I]f this was just a claim related to the roof, nothing about the sides and the undamaged and those other issues, we would still have—I think that the segment of the roof would be—could be resolved," and "if there's a dispute, it's nominal." It would appear, then, that the parties agree that there was roof damage and that the damage is a covered loss; they dispute only the loss amount. That type of dispute is covered by the appraisal provision, so that dispute must be submitted to an appraisal.

## II. Whether Windridge Submitted a Timely Claim

PIIC's opposition brief argued, in a single paragraph with no citation to pertinent authority, that Windridge did not provide it with prompt notice of the loss. Doc. 33 at 10. The court asked for and received supplemental submissions on the timeliness issue. Docs. 38-40, 43. Those submissions set forth little (if any) evidence, but given the very narrow scope of the appraisal being ordered, evidence is unnecessary to resolve the timeliness issue.

The policy required Windridge to give PIIC "prompt" notice of its loss. Doc. 28-1 at 18. The loss occurred on May 20, 2014, and Windridge provided notice to PIIC on September 23, 2014. Doc. 33 at 10. PIIC contends that this four-month delay was excessive, amounting to a breach that forfeits coverage. Windridge responds that its notice was timely.

"The purpose of requiring notice to an insurer … is to enable the insurance company to make the necessary prompt and thorough investigation of facts and circumstances affecting the

6

question of liability and the extent of liability." *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.*, 378 N.E.2d 355, 359-60 (Ill. App. 1978). In assessing whether notice is late, the court looks to whether the delay was reasonable and whether the insurer was prejudiced thereby. *See Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 346 (Ill. 2006) ("[W]e hold that the presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice.").

Four months is not an excessive delay. *See First Chi. Ins. Co. v. Molda*, 36 N.E.3d 400, 419-20 (Ill. App. 2015) (finding notice timely when it came thirty-one months after the covered event); *Berglind v. Paintball Bus. Ass'n*, 930 N.E.2d 1036, 1046 (Ill. App. 2010) ("We cannot say the 11-month delay in notification was unreasonable as a matter of law under the facts and circumstances of this case). PIIC cites no authority for the proposition that a four-month delay can be deemed unreasonable in circumstances comparable to those present here. Moreover, under the facts of this case, PIIC was not prejudiced by the delay.

As an initial matter, PIIC paid over $2.1 million on the claim without complaining of timeliness, which strongly indicates that PIIC was fully able to adequately investigate the claim. After all, if the timing of Windridge's claim hindered PIIC's investigation, it is highly unlikely that PIIC would have made such a substantial payment. Moreover, the only two disputes properly subject to appraisal—the roof (which PIIC's counsel admitted was no big deal) and the profit/overhead issue (which requires determining, based on the repairs made, whether a general contractor or only a single tradesman was required)—demand little, if any, investigation. Those two disputes therefore do not concern matters on which the delay, such as it was, had any bearing. If PIIC had any evidence to the contrary, it was in the best position to produce that evidence from its own files and personnel, and its failure to do so speaks volumes.

7

Accordingly, for purposes of Windridge's motion to compel appraisal and under the particular facts and circumstances of this case, Windridge's notice to PIIC was not untimely. In this regard, the court notes that the appraisal provision states, in relevant part, that "[i]f there is an appraisal, we [PICC] will still retain our right to deny the claim." Doc. 28-1 at 17. It may be that this language permits PIIC to raise a timeliness defense even after an appraisal has occurred, though there is no need to reach that question at this time.

## Conclusion

Windridge's motion to compel appraisal is granted in part and denied in part. PIIC must proceed to appraisal on the roof damage and overhead/profit issues, but not on whether it must pay to replace the building's north and east sides. PIIC has until February 16, 2017 to name an appraiser pursuant to the appraisal provision; if it does not do so, Windridge may move the court to appoint an appraiser in PIIC's stead.

January 26, 2017

United States District Judge